Drake, Ch. J.,
dissenting:
From so much of the opinion of the majority of the court as holds the claimant entitled to recover $4,050 for an additional quantity of brick put into the walls, over and,.above what he supposed, before he made his proposals, would be necessary, I am constrained to dissent.
The case, stated in condensed form, is as follows:
At the outbreak of the rebellion, certain brick buildings in the Norfolk navy-yard were burnt, but portions of the walls remained standing.
In 1866, the Bureau of Yards and Docks of the Navy Department advertised for proposals for the repair of those buildings, and the advertisement contained this clause:
“Persons desiring to bid must necessarily visit the yard and examine the present condition of the works, and can there see the plans and specifications, to enable them to bid understandingly.”
In anticipation of the repairs, the officers of the navy-yard had caused portions of the walls to be taken down; after which, and after the advertisements for proposals had been published, an agent of the claimant visited the yard and saw the plans and specifications of the work proposed to be done, and was shown the walls by a quarterman acting under the civil engineer of the yard. The agent asked if those walls were to stand. *198 The quarterman replied that they were, so far as he knew, and that Mr. Williams, the master mason of the yard, and Mr. Worrall, the civil engineer of the yard, had said that they were to stand. But it does not appear that the quarterman was authorized to make such representations to the claimant’s agent. And the civil engineer likewise represented to the agent that the portion of the walls then standing would remain and be used in the new work. After the claimant’s agent had so visited the yard and been shown the walls, the claimant made his bid, which was accepted, and the contract sued on was entered into in pursuance thereof.
After the claimant had begun work under the contract, it was discovered that about one-third of the walls still standing had been so injured by the fire as to be unftt for building a superstructure thereon; and thereupon the commandant of the yard ordered that portion of the walls to be taken down; which was done; and in consequence thereof the claimant was obliged to furnish bricks of the value of $4,050 over and above what would have been necessary if he could have built upon the walls as they stood when his agent examined them, before making his proposals.
The claimant, at the time, made no objection to that taking down of the one-third of the walls.
Upon the case as thus in substance stated, the majority of the court, as it seems to me, hold that there were tioo contracts between the claimant and the government: first, the written one sued on; and, secondly, a previous unwritten one, resulting from a visit of the claimant’s agent to the navy-yard and the then condition of the walls that were shown to him; from which condition and showing, it is claimed, resulted an implied undertaking and agreement on the part of the government, that the walls as they then stood and were shoion to the agent were fit to be used and should be used to support the new superstructure which the proposed repairs would require to be built upon them.
It is said that if no part of the old walls had been taken down by the government officers before the claimant entered into the contract sued on, or, in other words, if the walls had been seen by the agent in the exact condition they were left in by the fire, and had been turned over to the contractor in that exact condition, to be razeed by him to such extent as when he entered upon the work he might find necessary, the whole responsibility *199 would have rested on him, and upon him would bare fallen all tlie expense aud loss consequent upon the razeeing, however g'reat it might have been. In this view I concur; but when it is claimed that because before the agent visited the yard, and before any advertisement for proposals was published, the government caused a part of the walls to be razeed, it thereby said to all who might thereafter come to examine the parts left standing that it assumed the risk of those parts being fit to build upon, and, therefore, that those parts should stand as they were, and that the new work should be built upon them just as they stood, I am quite unable to see how so important an engagement could be held to grow out of the mere fact of the partial razeeing, standing by itself, without any declaration by any authorized representative of the government that the government intended that fact to amount to or to be regarded by any one as amounting to such an engagement.
But if it be supposed that this undertaking of the government resulted not alone from the fact that parts of the walls were left standing, but from that coupled with the other fact that the parts left standing were shown to the claimant’s agent by servants of the government, there is to my mind a sufficient answer to the proposition in the further fact that what the government intended to say in regard to the walls was not left to inference, but was precisely expressed in the written specifications of the proposed work, shown to and examined by the claimant’s agent at the time, and afterwards made a part of the contract. The existence of those specifications and the agent’s knowledge of them at the time, in my opinion, utterly preclude any implication against the government in regard to the walls, growing out of their having been left standing and shown to the agent. JSxpressum faeit eessare taciturn is a maxim which seems to me to close and bar the door against any such implication.
The agent visited the yard after the advertisement for proposals was published. What took him there ? Of course nothing but, in the words of the advertisement, “ to examine the present condition of the works and see the plans and specifications, to enable him to bid understandingly.” The government said to bim and all others, in effect, “There are repairs to be done at the Norfolk navy-yard, and the work is to be let out by contract. Go and examine the condition of the works, the plans, and the *200 specifications, and see whether yon will bid for the job.” That was all that government asked him to do, and all that he then had a right to dó, so far as the government’s invitation was concerned. The advertisement made no representations, except to indicate the particular buildings to be repaired; did not say that this or that wall or part of a wall was or was not to stand; simply left the whole matter to be examined by any one who thought fit to dp so. When the agent went there, he knew all that, or was bound to know it; and knowing it, he made such examination as he saw fit, without let or hinderance from any one, presumably taking his own time, using his own methods, extending his scrutiny at his own will, and, without doubt, relying on his own senses, his own observation, and his own judgment in reaching results. If he made a superficial or unskillful examination, or a careful and skillful but insufficient one, it was wholly at his own risk; the government had nothing to do with it.
If it was the intention of the Navy Department that the walls as they then stood should be built upon, every dictate of ordinary business capacity, of the plainest common sense, and of common houesty, would have prompted its announcement in the advertisement; but it was not there. So far from that, the specifications open with this stipulation:
“ The foundations and the brick walls now standing that were uninjured by the fire will remain and be carried up to the height designated on the plan, by new work.”
Whatever meaning may be ingeniously ascribed to those words, it is noteworthy that the claimant did not in his petition aver that he or his agent understood them at the time to mean that the walls then standing were fit to build upon and were to remain as they then stood; nor did his counsel, in his brief, take any such position; nor has either ventured to claim, much less has any attempt been made to prove, that the claimant’s bid was based on his or his agent’s understanding that that was the meaning of those words. If that had been his supposition, is it reasonable to suppose that he would not have averred and attempted to prove if? I think not. And because he did neither the one nor the other, it is to my mind conclusive evidence that he had at the time no such supposition.
' But, however that may be, those specifications were made a part of the contract, and it is the business of the court to declare their meaning.
*201 It is assumed tbat tills expression of tlie contract is doubtful, because its meaning cannot be rendered certain without the interpolation of words; and therefore the court must needs interpolate words. It is my misfortune not to be able to perceive any just grounds for doubt as to the meaning intended. Placing myself in thought, as nearly as I can, in the positions occupied by'the Navy Department on the one hand and the claimant on the other, it seems to me clear, first, that the department, to save expense and to secure solid and stable work, would mean to use all parts of the walls which were fit to sustain the new work, and not to use any parts which were so injured by fire as to be unfit therefor$ and, secondly, that the bidder, to avoid the danger of the old walls giving way under the weight of the new work, and so bring loss to him, would seek to avoid building new work upon walls or parts of walls that had been so injured by fire as to put him to that risk. It was therefore clearly to the interest of each party to use no parts of the old walls that had been injured by fire, and to use all the uninjured parts thereof, and unless some imperative reason be shown why. they did not express that intent in the clause in question, I am bound to hold that they did, and am not authorized to defeat that intent by inserting words in it.
It is claimed that the clause should be construed as if it read “The foundations and the brick walls now standing [being those portions] that were uninjured by the fire will remain.” But where is the authority for the interpolation included in brackets ? I know of no such authority. The parties themselves did not make it.
If it was the intention of the Navy Department to say what that interpolated sentence says, all that was needed to that end was simply not to have inserted the words “that were uninjured by fire,” and then it would read, “ The foundations and the brick walls now standing will remain and be carried up * * * by new work.” So framed, there could have been no question about the meaning; and if that had been the intention of the department, would it not have been so expressed %
"When, therefore, the clause was not so shaped, but those words were inserted, had they not a purpose and a meaning % When the sentence was made to read, “ The foundations and the brick walls now standing, that were uninjured by the fire, will remain and be carried up * * * by new work,” ought there *202 to be any reasonable doubt about the meaning ¶ Is it not clear that the intent was to except from the general stipulation the walls or parts of walls that had been injured by the fire? In •other words, is it not plain that what was to “ remain and be •carried up by new work ” was what was “ uninjured by fire ” ? When bids were asked for the repair of burnt buildings, is it •conceivable that the walls which had been injured by the fire, the very things that were to be repaired, should stand just as they were, without repair, and be carried up by new work?
But to my mind the claimant has, by his own acts, precluded himself from any recovery, on account of the razeeing of the walls after the contract was entered into.
For the sake of the argument, let it be admitted that the clause in question is ambiguous. It has been held by this court that if the parties to a contract, while the contract is in process of execution, do, either expressly or by tacit concurrence, agree or act upon a particular construction of it, neither party can after-wards set that construction aside and insist upon a different and inconsistent one. (Merriam’s Case, 14 C. Cls. R., 289; and see Swift & Co's Case, ib., 208.)
Can it be for a moment doubted that this claimant, while the work was in progress, tacitly acquiesced in the construction put by the government’s officers on this now for the first time disputed clause ? If the claimant really considered it his right under the contract to build upon the walls as they stood when his agent examined them, would he, when ordered by the commandant of the yard to razee one-third of them, have done so, and gone on to rebuild them, without uttering a word of objection ? Is it consistent with any sensible view of his capacity! to understand his rights under the contract, and how to proteo! them, to suppose that neither when the order to razee was givenl nor when he proceeded to obey it, nor yet up to the hour when! after the completion of the whole contract job, he received th<| final payment on account of it, he should have been dumb ? I
If, on the other hand, the previous examination had showii his agent that parts of the old walls, as his agent saw theml were, in fact, so injured by fire as to have to come down, ancj his bid was based on the knowledge of that fact and the calcuB lations necessarily resulting from that knowledge, his silencB when the razeeing was ordered and done is instantly and satisB factorily explained as an indication of his own consciousnesl that the razeeing was necessary and right, and had been hi *203 him calculated upon and estimated for before he framed the bid which got him the contract.
When, therefore, ou oue theory his silence is unnatural and inexplicable, and on the other is quite natural, and also quite consistent with our observation and experience of men, I am compelled to adopt the latter as the true theory of his action.
And when the silence remains unbroken until nearly six years after the whole work was done, and after he had rendered a bill purporting to chargefor all extra work done by him, as well as for the contract work, and had been paid in full, and then for the first time this claim is set up, I am constrained to the conviction that it is an afterthought and a mere speculative demand, as, in my opinion, it is without merit in conscience or justification in law.
But were every view I have expressed insufficient, there is one other which seems to me conclusive.
If the circumstances of the agent’s examination of the works, and what he then saw, are to have any effect towards the claimant’s recovery here, they are to have that effect by engrafting on the written contract a stipulation not found in its words. To do that-requires words to be inserted in the contract as signed and acted under by both parties. If any one rule in the law of contracts is settled, and has been so always, it is that such a thing cannot be done; and that when parties, after whatever conversation or preparation, at- last reduce their agreement to writing, that is to be looked upon as the final consummation of their negotiation and the exact expression of their purpose. The parties write the contract when they are ready to do so, for the very purpose of including all that they have finally agreed upon, and excluding everything else, and so make this certain and permanent. (2 Parsons on Contracts, 5th ed., 548; Oelricks v. Ford, 23 How., 49; Hawkins v. United States, 12 C. Cls. R., 181; affirmed on appeal, 96 U. S., 689.)
Discarding, then, all in regard to the walls but the one clause of the specifications which has been discussed, T hold that that clause is without ambiguity; that the claimant acted upon it las having the meaning put upon it by the Navy Department; [that he made no objection to what was required of him under p; and finally settled for his pay under it without protest or pemur. Such being the case, I can see no justification for ¡awarding him any part of the $4,050 allowed him by the majority of the court.